Hickey *v.* Beeler.

(*Knoxville*, September Term, 1942.)

Opinion filed May 8, 1943.

32

DEADERICK MOON and JOHN DINEEN, both of Chattanooga, for plaintiff in error.

GEORGE E. WESTERBERG, of Cleveland, and JOHN S. WRINKLE, of Chattanooga, for defendant in error.

MR. JUSTICE PREWITT delivered the opinion of the Court.

This case is before us on petition for *certiorari*. The petition presents two main issues: (1) That the will offered for probate was procured by reason of the undue influence of Oliver M. Hickey over the testatrix; and (2) that testatrix had, subsequent to the execution of the will in 1936, executed another will in which she made an entirely different disposition of her property. The second issue is the only one strongly stressed by petitioner; that is, petitioner insists that the declarations of the testatrix as to the will of 1936 are admissable as evidence.

Ida M. Miller was born in Bradley County, Tennessee, in 1874. On becoming of age she took her part of her father's estate and left home. She married a much older man and lived with him in Memphis until his death. Shortly thereafter she went West and there married a still older man by the name of Miller. He afterwards died and left her considerable property. At the time of the death of her second husband testatrix was a resident of the State of Oregon. Before her marriage to Miller testatrix met Oliver M. Hickey in 1912, an attorney of Aurora, Oregon. The record dicloses that Hickey represented her successfully and satisfactorily. She had much confidence in Hickey and, in addition to his professional

relationship with her, he was a close personal friend. This relationship lasted the remainder of her life, although she moved back to Tennessee in 1929 and Hickey moved to California. Ida M. Miller's maiden name was Ida M. Beeler. She had two brothers and one sister. Her brother John left home at an early age and at the time of this contest lived in Montana. Her sister, Minnie, lived in the State of Washington, and her brother Arthur lived in Tennessee. The record discloses that testatrix and her brother John were on strained relations.

In 1924 the testatrix had Oliver M. Hickey to draft her will, which was properly executed and attested. In this will she left one-third of her estate to her sister, Minnie, one-third to her brother Arthur, and one-third to Oliver M. Hickey. The will recites that the bequests to Hickey was made because he had befriended her when she first went to Oregon. This will was left with Hickey. After the testatrix left the West and came back to Tennessee she kept in touch with Hickey and his wife. It seems she had the utmost confidence in Hickey. She wrote him about all her legal troubles and asked his advice. He acted as her attorney and confidential adviser even though he was in California and she in Tennessee. She repeatedly invited Hickey and his wife to visit her here in this State. They did pay her a visit in 1939. She often expressed her wish to return West and live near the Hickeys. After her death a letter was found in her mailbox from Hickey and his wife.

The jury set the will aside, and the proponent Hickey appealed to the Court of Appeals. That Court reversed the lower court and remanded the case in order that a judgment could be entered upholding the will.

The above facts show that there was no undue influence on the part of Hickey toward the testatrix.

The second question presents a more serious situation. After the death of her mother in 1929 the testatrix purchased the interest of her brothers and sister in the old home place near Cleveland, Tennessee. She then moved from the West to this farm where she remained until her death. During the ten or eleven-year period she remained on the farm most of the time, rarely ever going to Cleveland. She lived alone. The record discloses that young boys and men frequently visited her to play Rook. She was said to have considerable amounts of money at her home. On November 20, 1940, she was found murdered in her living room, the house having been ransacked for money and valuables. Papers were scattered about the house and some burned on her body, which had apparently been set afire. Coal oil had been poured about the place. As soon as her death was discovered her relatives were notified.

John Beeler, the contestant, the brother who was left nothing under the will offered for probate, wired Hickey about testatrix's death and asked about the will. The proponent Hickey wired the contents of the will he had. The contestant, John Beeler, had a son known as "Little John." He was about thirty-two years old. As far as it is shown he had seen his aunt, Ida M. Beeler, only once some ten years before her death. This nephew did not attend the funeral.

In the summer of 1936 the testatrix had some trouble with a tenant and was indicted. About this time she visited a neighbor family and asked the man and his wife to witness her will. She produced a paper writing and said it was her will. She signed it in their presence, and the man and his wife signed as witnesses in her presence and in the presence of each other. They did

not read the instrument, and testatrix did not tell them anything of what was written therein. She then took this paper to a bank in Chattanooga and placed it in a safe-deposit box, which was taken out in the name of her sister. This box was later surrendered. On this trip to Chattanooga the testatrix visited a friend, Mrs. Ellen Rose, and told her she had deposited her will in this bank box. These facts are sufficient to show a validly attested will. Sizer's Pritchard Law of Wills, sec. 227. No one ever read this will or knew its contents. The will could not be found after testatrix's death. Shortly before her death she pointed to a trunk in her room and said her will was there.

In 1939 testatrix told a Mrs. Goodwin: "She said that because this place had been in her family maybe over a hundred years, that she intended to have it stay in the Beeler family, and she said, 'I want it to go to Little John,' that is the last thing she ever told me."

In 1936 testatrix is said to have told a Mr. Moore that "she was going to will her real estate to John Beeler's boy."

In November, 1940, Carl Jenkins testifies that testatrix told him: "She said she had made a will leaving her property to her nephew." This witness further testifies that she told him of making an earlier will in which she willed a one-third to her brother, a one-third to her sister, and a one-third to her lawyer. This witness says he saw no will.

The witness T. N. Jenkins testifies that testatrix said to him "that she had some buyers for the place, that she didn't want to sell it, that she had been offered a good price but she intended to let little John . . . have the bulk of her property and she had made a will to that

extent." These statements were related as having been made in November, 1940. This witness also says she told him of having made another will and that she had two wills. This was substantially all the testimony offered of the contents of the will subsequent to the will offered for probate herein.

 In *Allen* v. *Jeter*, 74 Tenn., 672, 674-676, this Court said:

"A written will of either real or personal property cannot be revoked by parol: *Allen* v. *Huff*, 1 Yerg., 404. A will duly executed and attested by witnesses, as required by the Code, sec. 2162, or in the testator's own handwriting, found and proved, as required by the Code, sec. 2163, can only be revoked by an instrument of equal solemnity: *Greer* v. *McCrackin*, Peck, 301, 14 Am. Dec., 755. The evidence of revocation, as it has been otherwise expressed, must be of dignity equal to the instrument revoked. The solemn and deliberate act of making and publishing a will, with all the formalities and requirements of the law, cannot be affected by verbal declarations, but there must be some act done plainly indicating an intention to revoke or annul, such as cancellation, destruction, and removal from the place of deposit: *Marr* v. *Marr*, 2 Head., 303, 304.

". . . It was, however, decided at an early day, that, in order to revoke a will, it is not sufficient that the existence of a subsequent will should have been found by a jury, it must be found to be different from the former, and even the latter finding will not avail, if it be added that the nature of such difference is unknown to the jurors: . . .

"Besides, where the last of two inconsistent wills is destroyed by the testator in his lifetime, the effect of

the revocation is to restore the prior will: 2 Greenl. Ev., sec. 683; 1 Jar. Wills, 123. And the presumption, in the case of a will traced into the hands of the testator and not found after his death, is that he has himself cancelled it.''

In *Moore* v. *Parks,* 1920, 122 Miss., 301, 84 So., 230, 240, the Court said:

''This testimony is hearsay, and was not admissible to prove the contents of the alleged lost will. In order to show a revocation of the Christmas, 1903, will, not only the execution of this alleged lost will must be proven but also its contents, showing inconsistent devises and bequests with the 1903 will. (Citing authorities.)

''But the contents of this will cannot be proven by the hearsay declarations of the testatrix. The court erred in submitting the question of the revocation of the will to the jury.''

In the opinion the Court also said:

 ''The question before us is ably discussed in the opinion of the United States Supreme Court in the case of *Throckmorton* v. *Holt,* reported in 180 U. S., 552, 21 S. Ct., 474, 45 L. Ed., 663. The issues in that case were forgery and revocation, but the court considered fully the admissibility of this character of testimony and refers to the cases on both sides of the question. Referring to the cases denying the admissibility of this testimony, it is said:

'' 'In the cases contained in class A, it is held that declarations, either oral or written, made by a testator, either before or after the date of the alleged will, unless made near enough to the time of its execution to become a part of the res gestae, are not admissible as evidence in favor of or against the validity of the will. The exception to the rule as admitted by these cases is that

where the issue involves the testamentary capacity of the testator and also when questions of undue influence over a weakened mind are the subject of inquiry, declarations of the testator made before or after, and yet so near to the time of the execution of the will as to permit of the inference that the same state of mind existed when the will was made, are admissible for the purpose of supporting or disproving the mental capacity of the testator to make a will at the time of the execution of the instrument propounded as such. These declarations are to be admitted, not in any manner as proof of the truth of the statements declared, but only for the purpose of showing thereby what in fact was the mental condition, or, in other words, the mental capacity, of the testator at the time when the instrument in question was executed.'

"Later on in the same opinion:

" 'It is quite apparent therefore that declarations of the deceased are properly received upon the question of his state of mind, whether mentally strong and capable or weak and incapable, and that from all the testimony, including his declarations, his mental capacity can probably be determined with considerable accuracy. Whether the utterances are true or false cannot be determined from their mere statement, and they are without value as proof of their truth, whether made by the sane or insane, because they are in either case unsworn declarations.'

"After discussing the opinion in Sugden's case [*Sugden* v. *St. Leonards,* L. R. 1 Prob. Div. 154], it is said:

" 'We are, however, convinced that the true rule excludes evidence of the kind we are considering. We remain of the opinion that the declarations come within no exception to the law excluding hearsay evidence upon

the trial of an action, and we think the exceptions should not be enlarged to admit the evidence.' "

*Throckmorton* v. *Holt, supra,* was approved by this Court in *Earp* v. *Edgington,* 107 Tenn., 23, 64 S. W., 40, and *Ricketts* v. *Ricketts,* 151 Tenn., 525, 267 S. W., 597.

█ It must be borne in mind that a second will does not necessarily revoke a former will. *Grimes et al.* v. *Nashville Trust Co.,* 176 Tenn., 366, 141 S. W. (2d), 890, 892. In that case this Court said:

"Although the jury might have well concluded that Grimes did make a second will, this will having been destroyed, its execution did not amount to a revocation of the first will, unless it was distinctly proven that the second will contained a revoking clause or that the terms of the second will were inconsistent with the terms of the first."

█ The declarations of the testatrix are in no wise supported by any other evidence. They stand alone. If these declarations are admitted, no man can safely leave a will and expect it to be carried out.

The record contains many letters of the testatrix which absolutely rebut declarations said to have been made by her to witnesses. On up until the time of her death there is everything to show her friendly attitude toward Hickey.

We are of opinion that the Court of Appeals reached the proper results, and the writ is denied.