MRS. HELEN T. BRUSTER, Admrx., etc., Proponent, v. GEORGE ETHERIDGE, Contestant. —345 S. W. (2d) 692.

Middle Section. September 2, 1960.

Certiorari Denied by Supreme Court March 10, 1961.

268

John J. Hooker, Sr., Nashville, W. M. Leech, Charlotte, for proponent.

Robert S. Clement, Ray Stuart, Dickson, for contestant.

I

SHRIVER, J. This is a will contest involving two wills of Lipe Henslee, deceased. The first is a typewritten will prepared by a lawyer and signed by the testa-

tor in the presence of witnesses, who attested same as subscribing witnesses. This will is dated February 10, 1957. The other is a holographic will dated August 4, 1957. Both are exhibited in the record.

The holographic will of August 4, 1957, was offered for probate in the County Court of Dickson County, Tennessee, and duly probated in common form. Mrs. Helen T. Bruster, the proponent of said will, and plaintiff in error here, was named administratrix with the will annexed in said holographic will. In due time defendant in error filed a petition contesting said will and offered for probate the typewritten will of February 10, 1957.

After an answer was filed the entire record was certified to the Circuit Court for trial on the issue of devisavit vel non and the case was tried before Judge J. H. Spencer, and a jury, resulting in a verdict and judgment against the holographic will and in favor of the will of February 10, 1957.

Proponent's motion for a new trial was overruled and an appeal in error was prayed and perfected to this Court and assignments filed.

## II

### Assignments of Error

The first and second assignments are to the effect that there is no evidence to support the verdict of the jury.

The third, fourth, fifth, sixth and seventh assignments complain of alleged errors in the charge to the jury.

The eighth assignment asserts that it was error to exclude from the consideration of the jury a tape recording

of a speech made by the testator on January 9, 1958, setting out the text of said tape recording.

The ninth assignment charges error because of the admission of certain testimony over the objection of the proponent.

## III

### The Issues

Counsel for contestant state that the issue in this case is, ''Did the testator, Lipe Henslee, have the capacity to make a will at the time the holographic will was written on August 4, 1957?''

There is no question made in the record as to the testators capacity to execute the will of February 10, 1957. This fact is nowhere in dispute.

It is further to be observed that the date on the holographic will is the only evidence of its execution on that date, however, there is no denial that it was executed on August 4, 1957 nor any insistence that it was written on any other date. There is only the suggestion by the contestant, George Etheridge, that it might have been dated back because he stated that Mr. Henslee, was asleep most, if not all, of the day of August 4, 1957 and heavily under the influence of drugs.

The trial Judge, in his charge to the jury, stated that the theory of the proponent, Mrs. Helen Bruster, is that on August 4, 1957, the testator, Lipe Henslee, wrote wholly in his own handwriting and executed his will and that it was delivered to her for safekeeping, and that the testator was not influenced by anyone in making the

will and that he was of sound mind and memory at the time.

On the other hand, it was stated in the charge that the theory of the contestant is that the testator was sick at the time of making the will of August 4, 1957 and was under the influence of narcotics or barbiturates, or other such drugs, to the extent that he was of unsound mind and that, at this time, he was easily influenced, and that he was unduly influenced by someone else to make the will of August 4, 1957.

## IV

## The Facts

The decedent, Lipe Henslee, died January 21, 1958. He was a prominent business man and citizen in his community and State. He was active in civic affairs and had held important political positions in both the State and Federal Governments, and he owned considerable property in and around Dickson, Tennessee, most of which he had inherited from his parents.

During the last few years of his life he was in poor health and suffered with a chronic heart condition that frequently caused agonizing pain. He had been taking narcotics and barbiturates to alleviate this pain and had developed an addiction to these drugs. As his condition of health became worse and his suffering more intense his addiction to drugs likewise became more pronounced until he almost constantly required sedatives in order to obtain relief, and these sedatives were administered generally by himself but occasionally by his physician. He frequently took such heavy doses of these drugs as to be-

come unconscious and remained thus for a number of hours at a time and sometimes for days.

During the early part of February 1957 Lipe Henslee was hospitalized with a heart condition, as he had been on several previous occasions. While in a hospital in Dickson on February 10, 1957, he engaged his lawyer, the honorable Frank S. Hall of Dickson, and Mr. Hall's secretary, to go to the hospital and prepare his will.

The pertinent provisions of the will dated February 10, 1957 are as follows;

"Second: I give, devise and bequeath to George Etheridge all of my land on the south side of Yellow creek highway in the Fifth Civil District of Dickson County, Tennessee. I also give and bequeath to the said George Etheridge all my cattle, all farming implements and tools, and the sum of Five Thousand ($5000.00) Dollars in cash. I request the said George Etheridge to keep up my cemetery lot so long as he lives.

"Third, I give, devise and bequeath the remainder of my estate, both real and personal, wherever located to Mrs. Helen Bruster of Dickson, Tennessee.

"Fourth, I hereby nominate and appoint the said Mrs. Helen Bruster Executrix of this my last will and testament and direct that no security be required of her as Executrix."

Said will was signed by Lipe Henslee and attested by F. S. Hall and Mary Frances Clayburn.

After his death, plaintiff in error, Mrs. Helen Bruster, produced the holographic will written by Lipe Henslee, bearing date of August 4, 1957, which will is as follows:

"I, Lipe Henslee, hereby make this my last will and testament revoking any and all wills I may have made in the past.

"I leave all my property, both real and personal to my friend Helen T. Bruster.

"/s/   Lipe Henslee"

George Etheridge, the contestant, at the time of the trial was a man 45 years of age who, with his wife and four children, lived on the place of the decedent Lipe Henslee for whom he had been working about twelve years. The record shows that he not only looked after the livestock and did other chores and jobs for Mr. Henslee during that time, but in the latter years of Mr. Henslee's life, waited on him at and in his home and was a very trusted servant and employee for whom the decedent manifested a great attachment.

The proponent, Mrs. Helen Bruster, a widow whose husband died in October 1949, and who had one son, had known Mr. Henslee for many years but was more closely associated with him during the last ten or twelve years of his life. They had business interests together and were associated together in connection with a drive-in theater in which they each owned stock. The record also shows that Mrs. Bruster was frequently in company with Mr. Henslee, being in his home on numerous occasions and was there at least twice on the day the will of August 4, 1957 was written.

Mrs. Bruster testified that she did not know the exact date but that Mr. Henslee called her and asked her to come to his home and when she went out there he told her that he had made a new will and that he wanted her to take it and keep it. She stated that she took the will under protest and went to the bank and offered it to Mr. Robinson at the bank but that he said he did not want to keep it, hence, she kept the will until after Mr. Henslee's death. She also testified that she knew about the former will; that she had it in her possession and that Mr. Henslee had told her to tear it up but that she refused to do so, but never did give the will back to him and she had it at the time she testified.

On cross examination, Mrs. Bruster stated that she was in Mr. Henslee's home on many occasions both day and night, that he had an iron safe there in his home where he kept valuables. That she saw him practically every day, and when asked whether principally in daytime or night she said, ''Well I don't know''. She also stated that she knew that he had been ill and that he had become addicted to the use of barbiturates and narcotics. She stated that she had seen him take large doses of these drugs and that she had seen him asleep under the influence of them but would not be competent to say whether he was in a coma or was unconscious from the effect of the drugs.

When asked whether the times she made the trips out to see Mr. Henslee were after or during the show hours, or before show time, she stated;

''It was very few times that he called me and said that he was ill during the day. Usually it was at

night, and it was usually between nine and ten o'clock, maybe ten or eleven.''

She was asked and answered;

''Q. And when you would be there and he would go into this sleep or under this sedation, it was later and after midnight on occasions, wasn't it? A. Yes sir, I imagine so.''

And on questioning Mrs. Bruster about where the holographic will was kept, she was asked and answered;

''Q. Now from and after that, he had no further access to it, did he? A. No, he didn't want to keep it.''

And she further answered;

''Well, he never had it after that.'' (That is, after the day it was written.)

She further stated that she kept the will in her lock box at the bank after it was given to her.

From the testimony of George Etheridge, Leon Bell and Dennis Etheridge it appears that on Saturday August 3, 1957, about six o'clock P. M., Mr. Etheridge went to the house with Leon Bell to get their weekly pay and it was discovered that Mr. Henslee was down on the floor of the bathroom, unconscious and against the door.

After a time, Mr. Etheridge was able to push the door open and they carried Mr. Henslee in an unconscious condition and put him on his bed. Later that night Mrs. Bruster came out to the Henslee house around nine o'clock, after which Etheridge left and went home. Mr. Henslee was asleep when he left. He testified that he

went over the next morning to do some work and that about eight o'clock Mr. Henslee "Roused up" and stated that he was feeling very bad and asked Etheridge to stay with him that day, which he agreed to do, although he had previously agreed to take his family on a trip that day. He asked Mr. Henslee about eating breakfast but he did not eat anything. He helped him to the bathroom about ten o'clock A. M. on August 4, 1957, stating, "He was wobbling and he went back to his bed and laid down". He saw Henslee take two capsules about eight or eight thirty A. M. Then about 10:30 he took three more and took some more about two o'clock P. M. He stated that the last time he saw him take these tablets on that day was about 4:30 or 5:00 o'clock, and when asked how many he took he said he did not know that Mr. Henslee just turned the bottle up and poured the capsules out in his hand and he couldn't tell just exactly how many he did take; that he thought that he took at least three or four at that time; that he then went to sleep and that he was asleep when the witness left.

He further stated that Mrs. Bruster came out to the house about 10:00 on Sunday morning August 4, but only stayed a few minutes; that she came back around two or two thirty and stayed about thirty minutes and that Mr. Henslee was asleep during all this time; that she returned again about seven thirty or eight o'clock P. M. when Mr. Henslee was still asleep and that he, Etheridge, left about nine o'clock with Henslee still asleep and Mrs. Bruster still there, and he did not know what time she left.

The next time Etheridge saw Mr. Henslee was the following Monday morning, at which time Henslee got up

in his pajamas and they had some conversation and Henslee wrote out checks for his and Leon Bell's wages for the past week.

He further testified that Mrs. Bruster was at the Henslee home much of the time but that she and Mr. Henslee had frequent quarrels and that on one occasion about three months before he died, he ordered Mrs. Bruster out of his house led her to the front gate and told her to go home, that he did not want her to come back again and to please quit aggravating him and, thereafter, ordered Etheridge to lock the front gate, which he did.

Dr. Walter A. Bell, a Dickson physician, stated that Lipe Henslee first came to him for medical service the latter part of 1953 and continued to be his patient until Henslee's death. He told about complying with his patient's request to call Frank Hall, a Dickson attorney, to go to the hospital to prepare a will for Henslee.

He testified that Henslee entered the hospital again on March 25, 1957, and when asked what his condition was at that time, he stated that the patient was almost dead from an over-dose of sedatives. He described barbiturates as primarily a central nervous system depressant and when asked what effect excessive use of this drug has on an individual, he answered;

"Well, usually, of course, it will make them real drowsy and sleepy and they want to sleep all the time. If they take them over a period of time they usually have very slow thinking and slow thought, they have failing memory, they don't remember things very well, and, of course, if they take enough they get completely incoherent where they know nothing. Then, of course, a little more than that,

they get to where they can't breathe. It affects their respiration.''

He also testified that Henslee was addicted to the use of barbiturates and sedatives and that decedent told him that he took about twenty-seven grains of barbiturates every night on top of some narcotics to sleep on. When asked what is the effect of barbiturates on one's memory, he answered;

"Well, I think you are going to have to consider Lipe more as a chronic as having barbiturate intoxication or poison. There is where you are going to have failing memory and blurring of speech. It is entirely possible that those people can take enough barbiturates today or tonight and that they will live through tomorrow and never know that they live through tomorrow. In fact, I have got one right now that Thursday night she had a big dose and she doesn't remember Sunday at all.

"Q. In other words, where it is taken excessively, a loss of memory necessarily follows? A. Yes sir.''

He also testified as to his visit to Henslee on the night of August 4, the date of the holographic will, and the circumstances regarding that visit. He was asked and answered with respect to his opinion as to whether or not Henslee was capable of transacting business on that date and his answer was, "I wouldn't think so." This question and answer are the subject of assignment of error No. 9 and will be discussed hereinafter.

■ ■ From the testimony hereinabove outlined and other evidence in the record, we agree with the learned trial Judge that there is material evidence to support the

jury verdict and that, in view of the rule announced in many of our cases that, in a will contest case, as in other cases before a jury, if there is any material evidence to support the verdict of the jury, it will not be disturbed on appeal in this Court, assignments 1 and 2 must be overruled.

In Jones v. Sands, 41 Tenn. App. 1, 292 S. W. (2d) 492, cited by counsel for the proponent in support of their position, it is to be observed that in said case, in line with an unbroken line of authorities in Tennessee, it was held, in passing on a motion for a directed verdict, the trial Court must look to all the evidence, construe it most favorably to the party against whom the motion is made, taking as true that which supports his rights, and allowing all reasonable inferences from the evidence in his favor, while discarding all countervailing evidence. Also see Poole v. First Nat. Bank, 29 Tenn. App. 327, 196 S. W. (2d) 563.

In the Sands case it was also held, that, in order to show mental incapacity of a testator in a will contest, it was not necessary to present any testimony that, at the moment the will was made the state of mind of the testator was such that he was rendered incompetent, if, from the proven surrounding facts and circumstances, the jury could have determined the state of the testator's mind when he signed the will.

Counsel for proponent earnestly argue that there is absolutely no evidence to sustain the contestant's charge of fraud, undue influence and unsoundness of mind of the testator and they call attention to the testimony of a number of witnesses who knew the deceased and who expressed the opinion that he was a man of sound mind.

On the other hand, it is insisted by counsel for the contestant that the issue in this case is as to the capacity of Lipe Henslee to make a will at the time the holographic will was written on August 4, 1957, and it is further insisted that, in spite of the fact which is recognized that the testator was generally a man of sound mind, nevertheless, when he was under the influence of narcotics and barbiturates he was incapacitated to know and understand his actions and that this was his condition at the time in question.

Assignments Nos. 3, 4, 5, 6 and 7, go to this proposition. They each attack certain portions of the charge to the jury wherein the trial Judge stated, in substance, that it was the theory of the contestant that the testator was sick at the time of making the holographic will and was under the influence of narcotics or barbiturates, or other such drugs, to the extent that he was of unsound mind at that time.

The portion of the charge complained of in assignment No. 4, is wherein the trial judge defined the terms, "Sound mind and disposing memory", and instructed the jury that the real question to decide was, "Did Lipe Henslee at the time he executed the will dated August 4, 1957, have a disposing mind and memory?"

In assignment No. 5, it is complained that the Court erred in charging the jury that, in considering the question of sanity or insanity the jury might consider evidence of the testator's mental and physical condition before and after the execution of the will, his appearance, conversations and declarations, etc. The Court further instructed the jury that mere physical weakness or disease, old age, weakened judgment and failing mind or

memory are not, necessarily, inconsistent with capacity to make a will, but such facts should be considered in determining whether or not the testator had sufficient capacity to make a will.

Assignment No. 6, complains of the charge wherein the Court instructed the jury that, when the proof shows that, at certain times the testator was of unsound mind, but at other times he had lucid intervals during which his mind and memory were sound, and that the will in question was executed during one of these lucid intervals, then, such will is not void because of insanity, even though the testator was of unsound mind both before and after the lucid interval during which the will was executed.

And in assignment No. 7, it is complained that the Court erred in charging the jury as to the definition or meaning of ''Lucid interval'', as to the burden of proof with respect to a showing of insanity, and as to the presumption of law with respect thereto.

It is the position of learned counsel for the proponent that all these instructions were erroneous because the question of insanity and lucid intervals were not before the Court, there being no evidence that the testator was of unsound mind and, particularly, on August 4, 1957.

■ We find no error in the charge of the Court as complained of in these five assignments of error, since it is established in the record and admitted by all parties that the testator was addicted to the use of narcotics and barbiturates and that he took these drugs in such amounts that he was often under the influence of them to the extent that he was incapacitated as described by Dr. Bell and the charge properly dealt with these conditions as they

may have affected the testator's capacity to make a will on August 4, 1957.

We think that the effect, insofar as it had to do with the testator's testamentary capacity, was similar to, and was subject to the same rules as those that have been applied to the effect of alcoholic beverages taken to excess and consequent drunkenness of a testator.

In Phillips' Pritchard on Wills and Estates, Vol. 1, sec. 114, it is said;

"Drunkenness is of itself a species of insanity, self-imposed; and long continued habits of intemperance may, in some temperaments, gradually destroy the mind and impair the memory and other faculties, so as to produce permanent derangement. But the mere fact that the testator was under the influence of intoxicating drinks will not, of itself, render the testamentary act invalid. To have that effect, it must appear that the habit of indulging in strong drink has produced some fixed mental disease, or that his present state of intoxication is such as to render him not master of himself and, therefore, irresponsible for his acts."

In support of the above statement the text cites, Key v. Holloway, 66 Tenn. 575, Peck v. Cary, 27 N. Y. 9, 84 Am. Dec. 220. 1 Page on Wills, 150, and the annotation in 67 A. L. R. 857.

In section 115 of the above text it is said that closely allied to drunkenness and the delirium frequently produced by it, is the delirium of disease, and that the rule of law by which the testamentary capacity of persons delirious from disease is to be judged is the same as

that stated in the preceding section. And in section 116, it is said, that while there is no presumption of the continuance of incapacity resulting from inebriety or disease that, after proof of excitement or delirium at the time of the act, the burden is upon the proponents of the will to disprove its existence in such degree as to vitiate the will. Citing Jarman on Wills, sec. 34, Note 1 and sec. 105 of the text, Pritchard on Wills.

In section 105, thus referred to, it is said that evidence of the testator's mental and physical condition before, at, and after the execution of the will, his appearance, conduct etc., or particular facts from which the condition of the testator's mind may be inferred, and the provisions of the will itself, are all competent on the issue of want of testamentary capacity. Citing many cases. And the text further states;

"The question of testator's insanity is to be submitted to the jury on the preponderance of the evidence with consideration of the presumption in favor of sanity."

Citing several Tennessee cases.

Citing Key v. Holloway, 66 Tenn. 575, as authority, the text states;

"And where the evidence leaves it doubtful whether or not sufficient capacity existed, the burden of removing the doubt is upon the proponents."

Assignments 3, 4, 5, 6, and 7, are overruled.

■ Assignment No. 8, charges that the Court was in error in excluding from consideration of the jury a tape recording of a speech made by the testator, Lipe Henslee, on January 9, 1958.

In the first place, the admission of such evidence as the playing before the jury of the tape recording in question, was largely within the discretion of the trial Judge, particularly, in view of the fact that the speech which was sought to be presented to the jury by a speaker device, was made several months after the date of the will in question, and had nothing to do with the will other than that proponent insists that it shows that the speaker was then a man of sound mind and intellect.

In Hickey v. Beeler, 180 Tenn. 31, 171 S. W. (2d) 277, it was held that, generally, a testator's declarations, either before or after the date of an alleged will, unless made near enough to the time of its execution to become a part of the res gestae, are not admissible in favor of or against the will, and that, where the issue is testamentary capacity, the testator's declarations made before or after, but so near the time of execution of the will as to permit the inference that the same state of mind existed when the will was made, are admissible.

For another reason, however, the Court was not in error in excluding the said tape recording. The facts surrounding the meeting on January 9, 1958 at which Mr. Henslee made a speech and was presented an award were admitted in evidence and the admission by the Court of the tape recording itself would have been cumulative evidence at best.

Assignment No. 8, is overruled.

Assignment No. 9, presents perhaps the most difficult question in this case. Said assignment charges error on the part of the Court in allowing the doctor to testify in response to a question largely hypothetical in nature, as to whether, assuming certain conditions set forth in the

question, the doctor was of opinion that Mr. Henslee was capable of transacting business on August 4, 1957, the date of the will in question. The doctor responded, "I wouldn't think so". It is said that this was error because it amounted to an invasion of the province of the jury.

Counsel for contestant had asked Dr. Bell several questions concerning the testator's capacity to execute a will on the day in question, the conditions surrounding, or alleged to have surrounded, the testator on the night before and the date of the will being laid in the question, and the Court sustained the objections of counsel for proponent to these questions. Counsel for contestant then asked the doctor his opinion concerning the testator's capacity to transact business and, after objection by counsel for proponent and discussion of counsel before the Court, the question was repeated and answered as follows:

"A. If August 3rd was the day he was in the bathroom and he had taken Sodium Amotal, which is a long acting barbiturate, to the best of my memory he told me that he didn't know anything about what happened for long hours afterwards. I am not going to say any specific hours, but he told me he didn't remember anything happening for hours after he had taken it. The best I remember, he didn't remember the fall. He didn't remember the fall at all and was told about it, that he fell and had to be gotten out. Now, what was the rest of your question."

The doctor was then asked and answered as follows:

"Q. Assuming that that was the night, that August 4th was the day following the night that he got down

in the bathroom that he told you about, about when he had taken this Sodium Amotal, assuming that, and that during the day he had taken excessive amounts of barbiturates in addition to that, I will ask you whether or not in your opinion he was capable of transacting business on August 4th. A. I wouldn't think so."

In considering the question involved here we need to look at some of the instructions given the jury by the trial Judge.

In the course of his charge he stated to the jury,

"As a general rule the opinions of witnesses are not admissible as evidence on the trial of cases in Court, but an exception is made in the contest of wills where the mental capacity of the testator is involved. Persons who sign the will as witnesses and physicians are permitted to give their opinions on the mental capacity of the testator, but other persons are permitted to give their opinions only after stating their acquaintance with the testator, his appearance, conduct, conversation and other particulars from which the jury may infer the state of his mind."

At another point he charged the jury as follows;

"The real question for the jury to decide in this case is, did Lipe Henslee, at the time he executed this will dated August 4, 1957, have a disposing mind and memory; was he capable of knowing what property he possessed and was about to devise and bequeath, the manner of distributing it and the objects of his bounty. In other words, were his mind and memory

sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed the will, and was he unduly influenced or did he execute the will voluntarily and of his own accord.''

And as particularly bearing upon this question, the Court charged the jury as follows;

''Mere physical weakness or disease, old age, eccentricity, or blunted perception, weakening judgment, failing mind or memory are not necessarily inconsistent with capacity to make a will, but such facts should be considered in determining whether or not the testator had sufficient capacity at the time of executing his will. Anyone having the soundness of mind necessary to make a contract may execute a valid will, however inferior his capacity or weak his understanding, and although at the time of executing it he was incapable of transacting business generally; but a person may also be capable of disposing of his property by will and yet incapable of making a contract to manage his estate.''

There is a distinction between the question of a testator's capacity to make a will and as to his capacity to transact business. As is pointed out in the charge of the Court, the incapacity to transact business, generally, does not necessarily, carry with it the incapacity to make a will.

In Railroad Company v. Brundige, 114 Tenn. 31, 84 S. W. 805, cited by counsel for proponent, the question was made as to whether or not a doctor could testify in reply to a question as to the plaintiff's ability to execute a contract, which, in that case, was a release executed

during the time that plaintiff was laboring under some disability. The court held that that question was the only one before the Court and jury and that the answer to such question would be an invasion of the province of the Court and jury.

Of course this is to be distinguished from the question in the case at bar. Here the testamentary capacity of the testator is in issue, not his capacity to transact business generally.

In Gibson v. Gibson, 17 Tenn. 329, a witness was asked whether or not, from the facts, he believed that the testator was in his senses and capable of making a will, and the Court stated that the attesting witnesses, only, are trusted to give their opinion merely and without cause or reason assigned of the testator's sanity, and that physicians may state their opinion of the soundness of the testator's mind, but they must state the circumstances or symptoms from which they draw their conclusions. In said case it was held that the question asked the witness and answered by him as to the ability of the testator to make a will constituted error.

In Wheeler v. Parr, 3 Tenn. Civ App. 374, many cases are cited and discussed and the Court with approval quoted from 68 C. J. sec. 26, page 430 as follows;

"It is generally held that less mental capacity is required for the testator to make a will than to carry on business transactions generally, to manage his estate or to make a contract or deed. * * * and a person who is competent to transact ordinary business is generally regarded as competent to make a will." See also, 94 C. J. S. Wills sec. 15.

In a number of jurisdictions it has been said that the test of testamentary capacity is not the capacity for transaction of business generally, but such capacity may exist where business capacity fails.

■ In view of the Court's instructions to the jury, and in view of our Harmless Error Statute, T. C. A. secs. 27-116, 27-117, and the numerous cases construing same, we are constrained to believe that the question asked and the answer of the doctor thereto, hereinabove quoted, were not such an invasion of the province of the jury as to constitute reversible error.

It results that all assignments are overruled and the judgment of the trial Court is affirmed.

Affirmed.

Hickerson and Humphreys, JJ., concur.