**IN THE COURT OF APPEALS OF TENNESSEE**
**EASTERN SECTION AT KNOXVILLE**

**FILED**

**July 24, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

IN RE: ESTATE OF LILLIE          )
KERLEY PORTER (DECEASED)          )          LOUDON CHANCERY
                                 )
SHIRLEY PORTER WHEELER and        )
TEDDY LEE PORTER,                 )
                                 )          NO. 03A01-9703-CH-OO105
    Plaintiffs/Appellants     )
                                 )
v.                               )          HON. FRANK V. WILLIAMS, III
                                 )          CHANCELLOR
THOMAS STEVE HARVEY,             )
individually and in his capacity as )
Executor of the Estate of Lillie Porter, )
                                 )
    Defendants/Appellees      )          AFFIRMED


Jess D. Campbell, Knoxville, for Appellants.
Mary Katherine Longworth, Peggy J. S. Monger, Loudon, for Appellees.


**O P I N I O N**

INMAN, Senior Judge

The dispositive issue in this case is whether Clyde and Lillie Porter contracted to make mutual wills.

Clyde and Lillie Porter were husband and wife. Each was married previously. Lillie was survived by an adopted son of her previous marriage, Thomas Steve Harvey, the defendant in this action. Clyde was survived by two children of a previous marriage, Shirley Porter Wheeler and Teddy Lee Porter, the plaintiffs herein.

On June 24, 1975, Clyde and Lillie executed their reciprocal wills. Each devised and bequeathed his/her entire estate to the other; the contingent beneficiaries were the same in each will. Each was appointed executor/executrix of the other's will.

On October 23, 1980 Lillie executed a codicil to her will expressly affirming and ratifying her 1975 will. She also appointed a different Executor whose name was later obliterated.

On October 26, 1984, Lillie executed another codicil by which she appointed still another person as executor, but whose name was later obliterated. She again ratified and confirmed her 1975 will.

On October 23, 1980, Clyde executed a codicil to his will by which he appointed Edwin H. Arnold Executor of his will, who was, circumstantially, the same person appointed by Lillie in her codicils, but whose name was obliterated.

Clyde died August 4, 1985. His will was duly probated through which his entire estate passed to Lillie.

Lillie executed another will, on September 14, 1990, by which she devised the bulk of her estate to her adopted son, the defendant herein. She executed a codicil to this will in 1993, appointing her son Executor, and increasing his share of the residual estate. She died November 22, 1993.

As may be deduced, it is this 1990 will - the "breaking of the faith" - which, upon its probate, triggered this litigation, filed by the two children of Clyde Porter who seek the specific performance of an alleged contract between Clyde and Lillie whereby they agreed that after the death of the survivor each plaintiff would receive one-third of their property, which would have been the case had Lillie not revoked her 1975 will.

In support of their theory, the plaintiffs tendered Lillie's discovery deposition taken August 18, 1986 which had been filed in an action by these plaintiffs in the Probate Court against Lillie as Executrix of the estate of her deceased husband, contesting the will of Clyde Porter.

The Chancellor ruled that the discovery deposition was inadmissible because (1) the parties in the will contest were not the same as in the case at bar, and (2) the issues were not the same.

The Chancellor found that the plaintiffs had failed to prove a contract as alleged, and dismissed the complaint.

The plaintiffs appeal and present for review six (6) issues, only one of which we need consider, that being whether the discovery deposition of Lillie was admissible on the issue of whether she and Clyde contracted to make mutual wills,

2

and, if so, whether it was, in conjunction with all the evidence, sufficient to prove the requisite contract. If this deposition is inadmissible, there is clearly no substantive evidence to support the complaint and hence no reason to consider the remaining issues.

Our review is *de novo* on the record, with no presumption of the correctness of the decision of the trial court on questions of law. *NCNB Nat'l Bank v. Thrailkill,* 856 S.W.2d 150 (Tenn. Ct. App. 1993).

The questioned deposition was taken in case No. 3885 styled *Shirley Porter Wheeler and Ted Lee Porter, plaintiffs, v. Lillie Porter, Executrix of the Estate of Clyde Porter,* in the Loudon County Probate Court. The plaintiffs alleged that they were the sole heirs at law of Clyde Porter, who died August 14, 1985, and that a paper writing dated June 24, 1975 together with two codicils executed in 1980 and 1984, purporting to be the last will of Clyde Porter, were admitted to probate. They alleged that said instrument was not the last will of Clyde Porter because he executed another will which was in the possession of Lillie Porter who was fraudulently suppressing it to her financial advantage. Other matters, not here relevant, were alleged.[1]

Because Lillie's testimony in the will contest is difficult to summarize, we reproduce it verbatim, as it pertains:

> Q:    Did you make a Will yourself at that time?
>
> A:    Uh-huh (positive).
>
> Q:    And I know I can read it, but before I do, did you and he
>        have any discussion about what you all would be doing
>        with your property?

---

[1]The plaintiffs are in a dilemma of their own making. The anomaly of contesting the will of Clyde Porter in an earlier litigation on grounds of *invalidity* while necessarily asserting its *validity* in this case to support their theory of mutuality of wills is readily apparent, keeping in mind that the plaintiffs seek the equitable remedy of specific performance of the alleged contract between Lillie and Clyde. The defendant raises the issue of judicial estoppel which we do not take lightly, since the policy of the law will not permit anyone to "gainsay what he has deliberately sworn to in the course of a judicial proceeding," *McLemore v. Charleston and Memphis R.R.W.,* 111 Tenn. 639, and 'public policy does not permit a complaint in a subsequent suit to set up a claim thus contradicted by him in a previous judicial proceeding.' *Hamilton v. Zimmerman,* 37 Tenn. 39 (1857).

A:   If he died first, he was willing everything to me; and if I died first, I was willing everything to him; and then, at our death, everything would be divided three ways. That's what he wanted.

Q:   Okay. So, regardless of how the deeds were or how things were, you wanted to be sure to take care of each other - - -

A:   That's right. We sure did.

Q:   - - - in your later years; and then, you and he wanted to see to it that there was no difference made between the children.

A:   Right.

Q:   He wanted to see that your son got his share and you wanted to see that his children got their share?

A:   That's right.

Q:   And that is how you and he understood your Wills?

A:   That's right.

Q:   And had you done a Will that would have accomplished that also?

A:   The Will hadn't been changed or anything. I don't know.

Q:   Well, did you do a Will in June of '75 also?

A:   Yes. We done it at the same time.

Q:   Now was it still you and your husband's intention in October of '84, that you and he would divide your estates once you all were all gone to take care of the three surviving children?

A:   Yes. That's what we intended to do and what we wanted to do.

Q:   And is that still what you wish to accomplish?

A:   Well, I would not cheat anybody out of anything.

Q:   Well, maybe we can - - -

A:   I want to do what Clyde said to do.

Q:   What is it that he told you to do that you want to do?

A:   Told me not to do anything until my death. He sat right out there in the yard.

Q:   He wanted you to live on this property until you died?

A:   He said to leave it like it was; he said if there's anything left after my death, why, he wanted to divide it three ways

4

but not until my death.

Q: All right. Okay. Now do you still - - - the Will you made in '75, have you changed it - - -

A: What Will?

Q: The Will in 1975 that you made at Don McMurray's office at the same time that Mr. Porter made a Will?

A: None of it has been changed.

Q: That's still your Will?

A: Uh-huh (positive).

Q: In other words, even though the real estate may have passed to you by deed as wife and co-owner of that property, are you advising us that what you want to have happen is the same thing you and your husband wanted to have happen in the beginning?

A: I want to do what Clyde wanted me to do.

Q: All right. Mrs. Porter, to continue the deposition, the 1975 Will basically has remained the same through these codicils with the exception of the executors being changed?

A: That's right.

Q: And has it been your - - - was it your agreement with Mr. Porter back in '75 when you all pooled your stuff together somewhat that you wanted each of your children to participate in whatever was left over of the estate once the two of you had lived - - - once the two of you had completed living?

A: Right.

Q: So, in essence, with you and your husband wanting to make sure that whoever of the two of you lived the longest, had the property for your life for whatever use you had to make of it. Is that correct?

A: Yes. He told me I could do anything I wanted. If I wanted to sell it, okay.

Q: All right. Under the circumstances if you had died before he - - -

A: To do the same.

Q: You wanted him to be able to live on that property until he died?

A: Oh, yes. Take it just like I did him. I mean my property over there - - - that I had over there and everything.

Q: What you've - - - assuming he'd died first, you would have

5

expected that he would have benefited from not only what he [sic] brought into the marriage, but what he brought into the marriage?

A:   Yeah.

Q:   And then, if he used it all up in his years of sickness or whatever that was all right with you?

A:   Yes.  And it was all right with him.  He was always afraid that somebody would have to take care of us and he said that we would try and save and do without help so that nobody would have to take care of us.

Q:   And now, going back to the situation that resulted, if he died before you, he wanted you to have not only your property but his property to live on?

A:   That's right.

Q:   And if you got sick and had to sell it all to live until you died, that was the way you all wanted it?

A:   That's the way he wanted it.  He told me that Saturday before we was in the hospital the next week.

Q:   All right.  He wanted it that way and you did too?

A:   Uh-huh (Affirmative).  That's what he told me and I didn't ask for it.  He just told me out there sitting in the yard.

Q:   Okay.  Now, if at the end of your all's - - - after both of you had passed on, if there was still property that had come from your family and come from his family, you all had decided the way you wanted it done was for each of the three children to get a third of it?

A:   Yes.  After I had died.

Q:   Whether there was a little bit of property or whether there was a lot of property?

A:   Right.

Q:   And do I understand that is your position still as far as your Will is concerned?

A:   I'm going to do what Clyde wanted me to do regardless.

Q:   All right.  And your Will has not been changed in that regard?

A:   No, sir.

·   ·   ·   ·   ·   ·   ·

This is heady testimony, since Lillie essentially admits she agreed to abide her

husband's wishes for reciprocal wills.  Her sworn resolve "to do what Clyde wanted

6

me to do regardless" apparently melted away on September 14, 1990, when she executed another will, essentially devising the estate she inherited from Clyde to her son, which was rather at odds with her previous intention to which she testified.

Under the earlier cases of *Daniels v. Combustion Engineering Co.,* 583 S.W.2d 768 (Tenn. Ct. App. 1978) and *Pridemark Custom Plating, Inc. v. Upjohn Co., Inc.,* 702 S.W.2d 566 (Tenn. Ct. App. 1985), the depositional testimony of Lillie in the case contesting the will of Clyde would not be admissible in the case at Bar because neither the parties nor the issues are the same.

The TENNESSEE RULES OF EVIDENCE were adopted in 1990. RULE 803(3) provides that a statement of the declarant's then existing state of mind . . . such as intent, plan, motive or design . . . relating to the execution, revocation . . . or terms of the declarant's will is not excluded by the hearsay rule, a departure from previous case law which excluded such evidence in will contests. This rule aligns Tennessee with the majority of States in admitting evidence of a mental state to prove the execution or terms of a will. *See, Hickey v. Beeler,* 171 S.W.2d 277 (Tenn. 1943),

RULE 804(b)(1) provides:

(1) <u>Former testimony.</u> Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross or redirect examination . . . [is] not excluded by the hearsay rule if the declarant is unavailable as a witness.

Under RULE 32.01, TENN. R. CIV. PRO., the same principle is applicable to depositions.

The appellee argues that RULE 804 specifically requires, as a condition precedent to the admissibility of Lillie's depositional testimony, that he shall have been accorded "both an opportunity and similar motive to develop the testimony," and that while he had the opportunity, he had no motive to develop the testimony. This argument appears to be well-taken in light of the obvious fact that neither the existence nor the validity of the purported contract between Clyde and Lillie was at

7

issue in the contest of Clyde's will; superimposed is the fact that it was a discovery deposition, as contrasted to a trial deposition, that was taken, and the appellee obviously had no motive to develop Lillie's testimony concerning a matter not pleaded or before the Court. This conclusion is strengthened by the official advisory comments respecting RULE 804(b) that the requirement of "both an opportunity and a similar motive" was carefully crafted to avoid the interpretation of the companion FEDERAL RULE 804 by the Sixth Circuit in *Clay v. Johns-Manville Sales Corp.,* 722 Fed.2d 1289 (1983).

For these reasons, we find that the defendant Harvey, who is the "party against whom the testimony is now offered" had no 'motive to develop' Lillie's testimony as to whether she and Clyde contracted to make mutual wills, and the deposition is thus not admissible against him in the case at Bar.

But if we are mistaken in this conclusion, we think Lillie's testimony in any event does not satisfy the requirements of Tenn. Code Ann. § 32-3-107, in earlier times known as the Troutman Act. This statute[2] provides:

> **32-3-107. Contracts to make or revoke wills. -** (a) A contract to make a will or devise, or not to revoke a will or devise, or to die intestate can be established only by:
> (1) Provisions of a will stating material provisions of the contract;
> (2) An express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or
> (3) A writing signed by the decedent evidencing the contract.
> (b) The execution of a joint will or mutual wills does not create a presumption of a contract to make a will, or to refrain from revoking a will.

The statute is described in *Junot v. Estate of Gilliam,* 759 S.W.2d 654 (Tenn. 1988), as "rigidly prescribing the requirements of a contract to make a will, not to revoke a will, or to die intestate." The Supreme Court held,

> "It prescribes *exclusive* [emphasis supplied] methods by which a contract to make a will, to revoke a will, or to die intestate may be established . . . the provisions [of which] are exclusive and mandatory . . . "

_____

[2]Enacted in 1977 with mostly precatory language. It was re-enacted in 1978 in its present form, apparently in response to the "large body of case law dealing with the subject," *Junot, supra.* It may not be applied in retrospect, but is applicable to the case at hand because the 1980 and 1984 codicils executed by Lillie reaffirmed and republished her 1975 will.

The execution of these 1975 reciprocal wills created no presumption of a contract to make a will.  Tenn. Code Ann. § 32-3-107(b).  The will must contain provisions stating material provisions of the contract, and there must be "an express reference in the will to a contract and extrinsic evidence proving the terms of the contract" or a writing signed by the decedent evidencing the contract.

Whether the reciprocal wills contain material provisions of the contract is arguable; but it is not controverted that neither will contains an express reference to a contract, and there is no writing signed by Lillie evidencing a contract.  Thus, we are taught by *Junot* [rigid, exclusive, mandatory] that the evidence is insufficient to establish a contract to make a will.

The judgment is affirmed at the appellants' costs.


_____
William H. Inman, Senior Judge


CONCUR:


_____
Houston M. Goddard, Presiding Judge


_____
Charles D. Susano, Jr., Judge