IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 8, 2000 Session

## IN RE: RHODA BELLE HUDSON ARMSTER

**Appeal from the Chancery Court for Lawrence County**
**No. 9501-99     Robert L. Holloway, Chancellor**

---

**No. M2000-00776-COA-R3-CV - Filed October 25, 2001**

---

This appeal involves a conservatorship action and an effort to set aside a will and related documents. Mrs. Armster executed a living trust, in which she named herself as the beneficiary during her life time. She also executed a will, which devised her entire estate to the trust and named The Bible Hygiene New Direction Training Center as beneficiary of the trust upon her death. Appellant, a child of Mrs. Armster, filed suit in Chancery Court and sought to: (1) have a conservator appointed for his mother to manage her legal and financial affairs; (2) have the trust and will set aside on the basis that his mother did not have sufficient mental capacity to execute the documents; and (3) have the will set aside because it was obtained as a result of undue influence. The trial court did not appoint a conservator and found that Mrs. Armster had the requisite mental capacity to execute the documents. Further, the court found that the will was valid as it was not the result of undue influence. We affirm the decisions of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Tom W. Moore, Jr., Columbia, Tennessee, for the appellant, Robert L. Armster, Jr.

Jane M. Jennings, Lawrenceburg, Tennessee, for the appellee, Shirley Nixon, Trustee and The Bible Hygiene New Direction Training Center Trust.

**OPINION**

Rhoda Belle Armster is the appellant's 78 year old mother. She and her deceased husband, Robert L. Armster, Sr., had four surviving children. The couple was drawn to health and evangelistic work and, once they had educated their children, they pursued the ministry and eventually moved to Tennessee. Shirley Nixon joined the Armsters' ministry in 1978 as a volunteer and became significantly more involved both personally and professionally with the Armsters over

the years.  Ms. Nixon began living with the Armsters in 1988.  Some of the Armster children resented her involvement.[1]

In 1990, Mrs. Armster suffered a head injury in an auto accident which caused a subdural hematoma.  According to the children, Ms. Nixon's role in the household grew even greater after Mrs. Armster's injury.  Ms. Nixon was responsible for the cooking and cleaning of the house and generally cared for Mr. and Mrs. Armster.

The Armsters bought a farm in Lawrence County in 1993 and formed the Bible Hygiene New Direction Training Center, where, with Ms. Nixon's help, they sold nutrition supplements and gave lectures and seminars.  Ms. Nixon also helped with management of the farm.  In 1998, after learning he had cancer, Mr. Armster met with an attorney and arranged for the preparation of several documents for Mrs. Armster and himself.  On September 10, 1998, Mr. and Mrs. Armster executed multiple documents.  The first document executed created a trust, The Bible Hygiene New Direction Training Center Trust ("The Bible Hygiene Trust" or "Trust"), which was funded by assets transferred to it by the Armsters and which benefitted the grantors[2] during their respective lifetimes.  The second set of documents executed were three warranty deeds signed by both Mr. and Mrs. Armster which transferred their interest in four[3] tracts of property to The Bible Hygiene Trust.  The third document executed was a durable power of attorney, signed by Mrs. Armster that gave Mr. Armster, and in the event of his inability, Ms. Nixon power of attorney.[4]  The fourth document was a living will signed by Mrs. Armster.[5]  The fifth document executed was the last will and testament of Mrs. Armster, which devised her entire estate to The Bible Hygiene Trust.

---

[1] The trial court found, "The four children appear to have great concern about the role Ms. Nixon gradually undertook with the Armster family.  They felt that she was trying to displace Mrs. Armster and to assume roles that should have been Mrs. Armster's.  As stated earlier, Mrs. Nixon appears to be acting in the best interest of both Mrs. Armster and the ministry.  The feelings of the children, although understandable from the standpoint that Mrs. Nixon lived with their parents for years, and assumed more and more responsibility as to the ministry and the farm, is not supported by the testimony of numerous witnesses who were around the farm and close to the Armsters."

[2] Mr. and Mrs. Armster were both grantors.  All net income from the trust was to be distributed to the grantor(s) or for their benefit during their lifetimes, or as the grantor(s) might designate.  Any net income not needed by the grantor could be used to further the purposes of the trust as set out.  After the death of the grantors, all income was to be used for the benefit of those persons whom the ministry and the trust were designed to help.

[3] One of the warranty deeds transferred interests in two separate tracts of land.

[4] The power of attorney signed by Mrs. Armster gives Mr. Armster or Ms. Nixon power and control over Mrs. Armster's property as well as power to provide for Mrs. Armster's medical needs.  The power of attorney gives her attorney, the power to "employ and compensate medical personnel . . . deemed by my Attorney needful for [Mrs. Armster's] proper care," and the power to "authorize any and all kinds of medical procedures and treatment . . . to obtain the use of medical equipment . . . deemed by my Attorney needful for [Mrs. Armster's] proper care."

[5] The living will provided that she authorized the withholding or withdrawal of artificially provided food, water, or nourishment or fluids.  The appellant has not challenged the validity of this document.

The document that established The Bible Hygiene Trust stated the purpose of the trust was "to benefit the Grantor throughout the remainder of the Grantor's life," and after the Grantor's death to provide "spiritual and physical care and training for all those who are poor, sick, and/or afflicted, and in need of such spiritual and physical care and training, and who submit themselves to the principles, health code, dress code, and Sabbath code established by the Bible Hygiene New Direction Training Center all to the glory of God."

The trust document named Mr. Armster as Trustee and gave him broad authority to manage and distribute the income and assets. The document further provided, "In the event of the death, resignation, or inability of Robert Armster, Sr. to act as Trustee, Shirley Nixon of Lawrence County, Tennessee is hereby named Successor Trustee to act with all the powers and discretion given herein to the original Trustee." The document named several other individuals to act in Ms. Nixon's stead in the event of her death or resignation, none of whom were the Armster children.

On October 19, 1998, Mrs. Armster executed a codicil to the September 10, 1998, will. After expressing her love for each of her children, she again devised her entire estate to The Bible Hygiene Trust. Her lawyer testified that it was his practice to name the children in wills affecting their rights and that their names had inadvertently been omitted in the initial will.

Mr. Armster, Sr., died in March 1999. Several weeks later, his son, Robert Armster, Jr., ("Appellant") filed the underlying action, in which he (1) sought a temporary restraining order which would prohibit Ms. Nixon from acting on behalf of The Bible Hygiene Trust; (2) requested the appointment of a guardian ad litem to represent Mrs. Armster in these proceedings and a conservator to manage her financial affairs; and (3) sought a declaration that the conveyances by Mrs. Armster to the Trust were void. Attached to the petition was an unsworn letter from Mrs. Armster's physician stating in pertinent part: "Dear Mrs. Armster has had a subdural hematoma with normal pressure hydrocephalus since 1990. I have known her since August of 1994, and she has been incompetent to even handle her activities of daily living. She has progressively deteriorated since that time." Appellant subsequently amended the petition to allege the documents executed by his mother were the result of undue influence on the part of Mr. Armster, Sr., and Ms. Nixon.

The trial court granted the temporary restraining order and appointed a guardian ad litem, who filed an answer on Mrs. Armster's behalf, which admitted that she was disabled due to her mental and physical infirmities. The guardian ad litem stated that "it would be in Rhoda Armster's best interest to be declared incompetent and have a conservator appointed for her." At the court's request, the guardian ad litem visited Mrs. Armster at her home, a double wide trailer in a remote area of the county. He stated that he believed Mrs. Armster was well taken care of by Ms. Nixon, a home health nurse, and another family friend. He noted that "Ms. Nixon appears to have genuine concern for her [Mrs. Armster's] well being." He also stated, "I have not changed my mind as to whether or not [Mrs.] Armster needs a conservator appointed. She is not capable, in my opinion, of looking after her business, and needs someone to look after her person as well as her business affairs." Further, he noted that "[Mrs.] Armster seemed to be more than adequately taken care of and seemed to be happy in her surroundings."

At the hearing on the matter, the trial court heard testimony from witnesses who were present at the time that Mrs. Armster signed the documents in question. These witnesses included Mr. Plant, the attorney who prepared the will and took it to Mrs. Armster, Ms. Grooms, the attorney who took the codicil to Mrs. Armster and observed its execution, Ms. Davenport and Ms. Peters, the two legal secretaries who accompanied Mr. Plant and Ms. Grooms and witnessed or notarized the documents, and Ms. Nixon. The trial court found:

> Mr. Plant, Ms. Davenport, and Ms. Peters testified in detail about the execution of the documents on September 10, 1998. Each of these witnesses appeared very credible. Mr. Plant testified that he went over the documents in detail with Ms. Armster, that he was satisfied that she knew and understood the documents, that they carried out her desires, and that she wanted to execute the documents. He testified that he would not have allowed Mrs. Armster to execute the documents had he not been certain that she understood them. He testified that Mrs. Armster answered every question put to her satisfactorily. Ms. Davenport and Ms. Peters testified that Mrs. Armster appeared competent and her responses were appropriate to the questions put to her.
>
> Ms. Grooms, Ms. Davenport, and Ms. Peters testified about Mrs. Armster executing the Codicil on October 19, 1998. Ms. Grooms testified that she explained the document and that she would not have allowed Mrs. Armster to execute the document had she been uncomfortable concerning Mrs. Armster's capacity to execute the Codicil. She testified satisfactorily concerning the correction of the name Roda to Rhoda by Mrs. Armster. Ms. Davenport and Ms. Peters confirmed Ms. Grooms testimony.

Appellant offered deposition testimony of Mrs. Armster's family physician, Dr. Nancy Armetta, who had not seen Mrs. Armster for a year prior to the signing of the documents. In her deposition, Dr. Armetta stated that when Mrs. Armster was her patient her mental condition was "slow," but noted that sometimes her mind was clearer than others. The doctor admitted that without having seen Mrs. Armster on the day the documents were executed, she could not say what Mrs. Armster's condition was then.

In addition, the children testified to their observations as to their mother's mental state at various times before the date of the execution of the documents and afterward. Appellant testified that his mother's problems began primarily with her last automobile accident or, more specifically, with events leading up to a hospitalization in 1993. In addition to being unable after that time to take care of her personal and care needs, he testified that his mother was mentally incapable of understanding the nature and consequences of signing documents such as the one in question.

The trial court found that Mrs. Armster was competent when she executed the documents and that neither Mr. Armster nor Ms. Nixon exercised undue influence. The court found that Dr. Armetta's testimony did not conflict with the testimony concerning Mrs. Armster's competence when

-4-

she executed the documents. Further, there was no medical testimony presented about Mrs. Armster's current medical condition. This appeal ensued.

Appellant argues three issues in his appeal. First, he contends that the trial court erred in not appointing a conservator for Mrs. Armster. Second, that the trial court erred by not holding that the will executed on September 10, 1998, was invalid because Mrs. Armster did not have the testamentary capacity to execute a will. In his third argument, Appellant asserts that the trial court erred in finding that neither Mr. Armster nor Ms. Nixon unduly influenced Mrs. Armster. Further, that the trial court erred because it did not find that a confidential relationship existed, which would give rise to a presumption of undue influence.

## I. The Appointment of a Conservator

In his petition, Appellant alleged that his mother was disabled due to both physical and mental infirmities and asked the court to appoint him as conservator for his mother with all rights "to manage her legal and financial affairs." A conservator is a person appointed by the court to "provide partial or full supervision, protection, and assistance of the person or property or both of a disabled person." Tenn. Code Ann. § 34-11-101 (1996). The conservatorship statutes vest the trial court with the wide discretion it needs to ensure that persons unable to take care of themselves or their affairs are properly cared for. *State ex rel. McCormick v. Burson*, 894 S.W.2d 739, 744-45 (Tenn. Ct. App. 1994). Thus, the purpose of a conservatorship proceeding is to determine whether a person is disabled such that she needs a court-appointed fiduciary to supervise, protect, and assist her person, her property, or both. *Bell v. Icard*, 986 S.W.2d 550, 557 (Tenn. 1999); *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995).

Accordingly, a petitioner in a conservatorship action must prove two facts by clear and convincing evidence before a fiduciary can be appointed: (1) that the person for whom the conservatorship is sought "is fully or partially disabled"[6] and (2) that the person "is in need of assistance from the court." Tenn. Code Ann. § 34-11-126 (1996); *Gray v. Zimmerle*, No. 01A01-9802-CH-00061, 1999 WL 23906, at *5 (Tenn. Ct. App. Jan. 22, 1999) (no Tenn. R. App. P. 11 application filed)*; Hendrix v. McGill*, No. 01A01-9709-PB-00536, 1998 WL 205268, at *2 (Tenn. Ct. App. Apr. 29, 1998) (no Tenn. R. App. P. 11 application filed); *Crumley v. Perdue*, No. 01-A-01-9704-CH00168, 1997 WL 691532, at *2 (Tenn. Ct. App. Nov. 7, 1997) (no Tenn. R. App. P. 11 application filed). If the court finds that appointment of a conservator is warranted, then it has an affirmative duty, when it fashions the powers removed from the ward and given to the conservator, "to ascertain and impose the least restrictive alternatives upon the disabled person which are consistent with adequate protection of the disabled person and the disabled person's property." Tenn. Code Ann. § 34-11-127 (1996); *Walker v. Graves*, 174 Tenn. 336, 341, 125 S.W.2d 154, 156 (1941).

---

[6]A disabled person is defined as "a person 18 years of age or older determined by the court to be in need of partial or full supervision, protection, and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity." Tenn. Code Ann. § 34-11-101(7) (1996).

Because a conservator may be granted full or partial supervision over and responsibility for either the person or the property of the conservatee, or both, courts distinguish in appropriate cases between personal conservators and financial conservators. *Crumley*, 1997 WL 691532, at *3 (upholding the trial court's decision to appoint a conservator over the care of the person and reversing the trial court's decision to appoint a financial conservator). Proof of physical disability would allow the court to appoint a conservator over the care of the potential conservatee, but not necessarily his or her finances. *See Gray,* 1999 WL 23906, at *3. In proceedings to appoint a financial conservator, this court has stated that even when a person "cannot take care of himself without assistance" due to a "physical condition," the result is not necessarily that "assistance must come in the form of a conservator to make decisions for him." *Id.* In *Gray*, the court held that someone who was "substantially in possession of his reasoning facilities, but . . . physically impaired as a result of [a] stroke" was not in need of a conservator. *Id.*

Because the potential conservatee must be in need of the court's assistance as a prerequisite to appointment of a conservator, courts have refused such appointment where the conservatee and/or her property is already being adequately cared for. *See Smith v. Smith*, 55 Tenn. App. at 162, 397 S.W.2d at 197-98 (potential conservatee had chosen to live with one child, was physically well cared for and was found capable "with the assistance of the agent or agents chosen by her" of "managing her own person and estate without the intervention of a conservator"). Where the potential conservatee has made decisions for care of herself or her property while competent to do so, courts may refuse to set aside those arrangements and appoint a different conservator.

That was the result in *Crumley v. Perdue*, wherein Mr. Perdue had executed a durable power of attorney in favor of Ms. Green to handle all of his financial affairs. *Crumley*, 1997 WL 691532, at *1. The trial court disregarded the power of attorney and appointed a different financial conservator. This court reversed on the basis that the petitioners had failed to establish by clear and convincing evidence that the potential conservatee needed the assistance of the court with regard to his financial affairs because "the durable power of attorney granted Ms. Greene full authority to act on Mr. Perdue's behalf with respect to any business or financial matter." *Id.* Therefore, in order to justify the appointment of a financial conservator, it would be necessary for Ms. Crumley to "produce clear and convincing evidence that the court should not permit Ms. Green . . . to continue as Mr. Perdue's attorney in fact." *Id.* at *3. The court held the petitioners would be required to show that the power of attorney should be set aside, and to do so they would need to prove that (1) Mr. Perdue was incompetent at the time he executed the durable power of attorney, (2) he was under undue influence when he signed it, or (3) by showing that Ms. Greene was unable to perform the duties of financial conservator.[7] *Id.*

The trial court's decision in the case before us rests on the same principles as the *Crumley* decision. If Mrs. Armster's person and property were already adequately cared for, through arrangements she made when competent to make them, she was not in need of assistance from the

---

[7]The issue of undue influence will be discussed in a separate section. Appellant has not argued that Ms. Nixon was unable to perform the duties of financial conservator.

court, and the request to appoint a conservator was properly denied. At the trial, counsel for the trust made it clear that the appellees did not contest the need for someone to care for Mrs. Armster, but maintained that arrangements had been made to ensure that protection and care: in effect, Mrs. Armster had chosen her own conservator.

With regard to Mrs. Armster's physical care and living arrangement,[8] the trial court found that Mrs. Armster lived on a farm in a remote section of Lawrence County, which she and her husband had purchased in 1993. She was cared for by Ms. Nixon, who had lived with the Armsters since 1988, as well as a home health aide. Based upon the testimony of several witnesses, the trial court found that Mrs. Armster was being well cared for and that "Ms. Nixon seems to deeply care about both Mrs. Armster and the ministry."

The evidence supports the trial court's implicit determination that Mrs. Armster is not in need of court intervention because her physical well-being is adequately cared for by Ms. Nixon. Mrs. Armster has allowed and even directed, by the power of attorney, that Ms. Nixon care for her. A longtime friend who visited with Mrs. Armster before the trial testified to the good and tender care provided to Mrs. Armster by Ms. Nixon. Several witnesses testified as to the type of care being provided Mrs. Armster, including home health workers, physical therapy, and speech therapy. Further, the guardian ad litem appointed by the trial court stated that, "it was apparent that [Mrs. Armster] was getting adequate care, and that Ms. Nixon appears to have genuine concern for her well being." Further, that "[Mrs.] Armster seemed to be . . . happy in her surroundings." Because the power of attorney gives Ms. Nixon authority to approve medical treatment, Mrs. Armster's future well being is protected from any future incapacity.

Also implicit in the trial court's holdings is a finding that Mrs. Armster was not in need of court assistance to protect her property because of the arrangements she had made in 1998. The trial court implicitly determined that Mrs. Armster's finances were, in fact, adequately cared for by the trust that she and her husband established and by the power of attorney that Mrs. Armster gave to Ms. Nixon. The trust, which benefits Mrs. Armster for her lifetime and then benefits a mission to which she and her husband dedicated their lives, adequately protects her assets and financial needs during the duration of her life. She has assigned decision making responsibility over her financial affairs to Ms. Nixon so that her property and financial well-being are protected from any disability on Mrs. Armster's part.

Appellant seeks to set aside these arrangements made by his mother in 1998. To do so, he must demonstrate, as he has alleged, that the dispositions were invalid because either (1) Mrs.

---

[8]Appellant's petition did not specifically request a personal conservator or someone to oversee his mother's physical and medical well-being, instead he requested that the court that "he be conveyed with all rights to manage [Mrs. Armster's] legal and financial affairs." However, the other son who testified, although not a party, stated that the children would like to have a conservator appointed to look after their mother's medical and physical wellbeing even if the trust remained in effect. The power of attorney signed by Mrs. Armster gives decision making authority for medical treatment to Ms. Nixon. Therefore, even if Appellant had specifically requested that a conservator be appointed to protect Mrs. Armster's physical well-being, the analysis would be the same: whether the power of attorney is valid.

Armster was not competent to execute the documents and/or (2) she was unduly influenced into signing them.[9] *Crumley*, 1997 WL 691532, at *6. These issues were the primary subject of the trial court's findings and are the primary subject of the briefs on appeal.

## II. Sufficient Mental Capacity

Appellant argues that Mrs. Armster did not have the requisite mental capacity to execute the power of attorney, trust agreement, warranty deeds or the will, all of which were executed on September 10, 1998.[10] The trial court found that Mrs. Armster was competent to execute the documents. We review that finding of fact *de novo* with a presumption of correctness, and we will not disturb it unless the evidence preponderates against it or until it is based on an error of law. Tenn. R. App. P. 13(d); *Coffman v. Washington Co. Beer Bd.*, 615 S.W.2d 675, 677 (Tenn. 1981); *Town of Bruceton v Arnold*, 818 S.W.2d 347, 349 (Tenn. Ct. App. 1991); *Brewington v. Sanders*, No. 01A-01-9301-CV-00002, 1994 WL 189626, at *4 (Tenn. Ct. App. May 18, 1994) (no Tenn. R. App. P. 11 application filed). Further, the trial court's finding was based on the court's determination of the credibility of the witnesses who testified and was made after hearing all of the testimony presented. The trial court is in the best position to judge the credibility of the witnesses and his findings of fact will not be disturbed unless there is a preponderance of real evidence to the contrary. *Jackson v. Bohan,* 861 S.W.2d 241, 246 (Tenn. Ct. App. 1993); *Interstate Fire Ins. Co. v. Kinbrough*, 852 S.W.2d 887, 892 (Tenn. Ct. App. 1992); *Tenn-Tex Properties v. Browness-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Brown v. Weik*, 725 S.W.2d 938, 946 (Tenn. Ct. App. 1983); *Brewington*, 1994 WL 189626, at *4; *Lovett v. Kitchen*, 1989 WL 79142, at *1 (Tenn. Ct. App. July 18, 1989) (no Tenn. R. App. P. 11 application filed). Accordingly this court gives great weight to findings of fact that require the trial court to resolve "conflicts in the proof and to decide the weight to be given witness' testimony." *Brewington*, 1994 WL 189626, at *4.

Appellant asserts that the mental capacity to execute a legal document varies according to the document. He asserts that the standard applicable to deeds, for example, is whether the grantor had intelligent comprehension of the act being performed and is capable of transacting business. While we do not specifically disagree with the proposition that different standards have been articulated by the courts of this State for testing the validity of executed instruments, we think such fine distinctions, if any, are not useful herein as far as practical application which would affect the outcome.

The mental capacity required to execute a general durable power of attorney, revocable living trust and warranty deed are essentially the same and equate to the mental capacity required to enter into a contract. *See Lovett*, 1989 WL 79142, at *1 (stating that the mental capacity necessary to execute a deed and a power of attorney "must be the conscious, voluntary act of the grantor or it will be held void; likewise, the deed will be declared void if the grantor was mentally unbalanced, had no

---

[9] Appellant has not alleged that Ms. Nixon is incapable of performing the duties of financial conservator or her duties under the trust or the power of attorney.

[10] The codicil naming the children, although making no bequest to them, was executed October 19, 1998.

-8-

intelligent comprehension of the act being performed *and* was incapable of transacting at the time of the transfer") (emphasis added); *see also Golden v. Hood*, No. E1999-02443-COA-MR2-CV, 2000 WL 122195, at \*2 (Tenn. Ct. App. Jan. 26, 2000) (no Tenn. R. App. P. 11 application filed) (defining lack of capacity to enter a contract as "a lack of 'sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of an act or transaction in which he is engaged'"); AUSTIN WAKEMAN SCOTT & WILLIAM FRANKLIN FRATCHER, THE LAW OF TRUSTS § 18, at 243 (4th ed. 1987) (stating "courts of equity have laid down no special rules as to capacity to create a trust, but merely follow the legal rules that are applicable to analogous transactions").

The party attempting to invalidate a contract based on the theory of mental incapacity bears the burden of proof. *Knight v. Lancaster*, 988 S.W.2d 172, 177 (Tenn. Ct. App. 1998). To set aside a deed or a contract, the proof must be clear, cogent, and convincing. *Gregory v. Gregory*, No. 01A0119508CH00357, 1996 WL 47929, at \*8 (Tenn. Ct. App. Feb. 7, 1996); *see also Myers v. Myers*, 891 S.W.2d 216, 219 (Tenn. Ct. App. 1994). When discussing the capacity necessary to contract, the *Knight* court stated:

> "To avoid a contract it is insufficient to show merely that the person was of unsound mind or insane when it was made, but it must also be shown that this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature or terms of the contract.
>
>  . . . the mental incapacity . . . must . . . at the time [of the making of the contract constitute] such impairment of reasoning powers as to make the person incapable of acting rationally in the transaction involved, or such mental unsoundness as occasions an inability to comprehend the subject of the contract and its nature and probable consequences . . . *and* there must be an entire loss of a person's understanding as respects such transaction."

*Id*. at 178 (quoting 17 C.J.S. *Contracts* § 133(1)(e)) (emphasis added);[11] *see also Roberts v. Roberts*, 827 S.W.2d 788, 792 (Tenn. Ct. App. 1991) (adopting and quoting at length the same standard). Further, the court must only consider the mental capacity at the moment of execution of the document. *Harper v. Watkins*, 670 S.W.2d 611, 629 (Tenn. Ct. App. 1983).

---

[11]The current section from Corpus Juris Secundum now reads:

> . . . [A] mere mental weakness falling short of incapacity to appreciate the business in hand will not invalidate a contract, nor will mere mental weakness or unsoundness to some degree, in absence of fraud or undue influence. For a contract to be valid despite the alleged lack of mental capacity of one party, it is not necessary that the party have the ability to make a reasoned judgment concerning the agreement. Moreover, no degree of mental weaknesses short of an entire lack of understanding will vitiate a contract in the absence of fraud or imposition.

17A C.J.S. *Contracts* § 141, at 45 (1999) (footnotes omitted).

Similarly, to have testamentary capacity a person must be able to comprehend the property being disposed of, the manner of its distribution, and the persons receiving the property. *McCormack v. Riley*, 576 S.W.2d 358, 361 (Tenn. Ct. App. 1978). In cases where there is a properly attested will, there is a presumption in the law that the decedent was of sound mind and possessed the requisite testamentary capacity to make the will. *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 217 (Tenn. Ct. App. 1998). Further, the inquiry must center on the decedent's mental condition at the time of the execution of the will and a contestant must introduce strong evidence to establish a lack of testamentary capacity at the time of the execution of the will. *American Trust & Banking Co. v. Williams*, 32 Tenn. App. 592, 603, 225 S.W.2d 79, 84 (1948). There must be material, substantial and relevant evidence to show a lack of mental capacity at the time of execution. *Hammond v. Union Planters Nat'l Bank*, 189 Tenn. 93, 100, 222 S.W.2d 377, 380 (1949). This court has stated that "testamentary capacity requires less understanding than that required to execute a contract." *Brewington*, 1994 WL 189626, at *4 (citing *Bruster v. Etheridge*, 48 Tenn. App. 267, 287, 345 S.W.2d 692, 701 (1960); *Melody v. Hamblin*, 21 Tenn. App. 687, 694-95, 115 S.W.2d 237, 242 (1937)).

The trial court herein rested its decision that Mrs. Armster was competent to execute the challenged documents on the basis of proof of capacity on the date of execution. The court found credible the testimony of the witnesses who were present at the execution. As the court found, Mr. Plant, the attorney who prepared the documents testified that he went over the documents in detail with Mrs. Armster, that he was satisfied that she knew and understood the documents, that they carried out her desires, and that she wanted to execute the documents. He testified he had practiced law for twenty-five years, had prepared hundreds of wills, and that he would not have allowed Mrs. Armster to execute the documents had he not been certain that she understood them. He testified that Mrs. Armster answered every question put to her satisfactorily. About the later-signed codicil, Ms. Grooms, an attorney with Mr. Plant's office, testified that she would not have allowed Mrs. Armster to execute the document has she been uncomfortable concerning Mrs. Armster's capacity. Further, she stated that Mrs. Armster had corrected her spelling of her name on the document from Roda to Rhoda.

Specifically, Mr. Plant testified that he explained to Mrs. Armster the import of each of the documents and what would happen if she signed them. He was convinced it was her desire to execute them. He discussed with Mrs. Armster the use the Armsters were making of their property, operation of the center, and her intention that that use continue. He acknowledged that Mrs. Armster's answers were slow coming, but that her answers had all been satisfactory. He discussed with the Armsters his preference to prepare a codicil naming the children in order to clarify their intent to leave their estates to the trust to the exclusion of the children.[12] He was satisfied that was their desire.

Ms. Peters, who worked in Mr. Plant's law office during the relevant time period, but no longer worked there, testified as to her observations of the execution of the documents. She stated

---

[12]This codicil stated that "I love each of my children, and the children of my late son . . . but it is my request, and I hereby direct, that my entire state go to The Bible Hygiene New Direction Training Center Trust."

-10-

that Mr. Plant read over all the documents with Mrs. Armster and went over each of them thoroughly. The attorney asked her questions, and Mrs. Armster answered correctly. As he was explaining the provisions of the documents, he stopped and asked Mrs. Armster if she understood. She generally answered yes. If she didn't understand something, Mr. Plant would explain it to her until she did. Although the witness could not recall every question asked, she did remember that Mr. Plant asked Mrs. Armster her name and asked her to name her children, and she did. He asked Mrs. Armster if she realized she was giving her property to the trust, after asking her to name her children. Ms. Peters testified that Mr. Plant explained the power of attorney as giving the right to sign for Mrs. Armster on just about everything, including bank accounts.

The witness described Mrs. Armster as alert on that occasion and described her as slow in answering. To clarify, she stated:

> She was just really sweet. She's quiet, and she answers slow, but she seemed fine. She's a little slow as far as answering, but when she answers she says the right - - she gives you the right answer. . . . She just seemed like that she thought about things before she would answer.

The witness also explained the actual process by which Mrs. Armster signed the documents. She was in her wheelchair, and the arms of the chair interfered somewhat with the movement of her arms. Someone held a pillow in her lap, and Mrs. Armster placed the documents on the pillow. "She wrote her name on her own. The only thing that anyone did was hold the pillow straight for her to write. No one held her hand or anything." The witness commented that Mrs. Armster "was laughing about" her sometimes including her maiden name "because she thought she had messed up." Ms. Peters was totally satisfied that Mrs. Armster understood the documents she signed and understood what she was doing by that action.

The other law office employee, Ms. Davenport, described Mrs. Armster as well-spoken and kind. She confirmed that Mr. Plant went over the provisions and effect of the documents and asked or answered questions. She stated that when Mrs. Armster was asked to name her children, she named four; when asked if there weren't one more child, Mrs. Armster replied that he was deceased. She also recalled Mrs. Armster commenting on her writing, stating "I'm a little bit shaky. I used to write so well. I'm not writing very well today." Ms. Davenport also returned with Ms. Grooms for the signing of the codicil. She testified that Mrs. Armster acknowledged they had met before and welcomed them back.

Ms. Torres testified by deposition. She was employed for about two years by the Armsters, serving as a home health aide for Mrs. Armster as well as performing household tasks and some work for the center. She was working for the Armsters when the documents were executed, but left shortly thereafter. Her testimony was that Mrs. Armster, while sometimes "quite foggy," had "clear day[s]." She characterized Mrs. Armster's mental functioning as varying. For example, although sometimes Mrs. Armster seem confused about which of the three houses on the farm she currently lived in (she had at one time or another lived in all of them), this type of confusion was "on and off. . . . Sometimes

she would have it, sometimes she wouldn't." Although Mrs. Armster never discussed with her the documents at issue, Ms. Torres did not consider that unusual, stating "she's not a person to initiate conversation. Only when asked a question of something like that, but she wouldn't initiate." When asked whether Mrs. Armster would have understood what a revocable trust was, Ms. Torres replied, "Not on her own." When asked if Mrs. Armster were presented with a deed and asked to sign it, would she have understood she was conveying the property, Ms. Torres replied, "If that was explained to her she would have known that, but not on her own."

Ms. Bland, who had been a friend of Mrs. Armster since 1947 also testified. Their relationship began when they were prayer partners. They had visited each other at times over the years, corresponded, and visited by telephone. Although Ms. Bland had not visited in Mrs. Armster's home in a number of years, she came to see her and stayed with her a while before the trial. Ms. Bland testified that although she had not seen Mrs. Armster for several years, Mrs. Armster recognized her immediately when she walked in, calling her "K.B." as she always had. "The she said, 'It's about time.' Then she talked to me about - - just talked to me like she always did." They had prayed together over this visit, and Ms. Bland commented on Mrs. Armster's vocabulary. Ms. Bland described their activities and conversations and expressed no concern about Mrs. Armster's mental functioning. She was complimentary of the care Mrs. Armster receives from Ms. Nixon and friends and neighbors.

Mr. Armster's petition for appointment of a conservator was accompanied by an undated letter from Dr. Nancy A. Armetta which stated that Mrs. Armster has had a chronic subdural hematoma since 1990. "I have known her since August of 1994, and she has been incompetent to even handle her activities of daily living. She has progressively deteriorated since that time." This information was explained or supplemented by the deposition of Dr. Armetta, which constituted the only medical evidence regarding Mrs. Armster. Dr. Armetta had first seen Mrs. Armster in August of 1994. Dr. Armetta's records indicate Mrs. Armster suffered from a subdural hematoma. Although she had been told about the 1990 accident and 1993 hospitalization, Dr. Armetta had never received or reviewed the past medical records. Dr. Armetta last saw Mrs. Armster in September of 1997, a year prior to the execution of the documents. Dr. Armetta's primary concern was Mrs. Armster's physical condition, and she never gave Mrs. Armster an examination of her mental status. Dr. Armetta testified:

> . . . as I noted on the initial exam, and I don't think I may have addressed it too specifically otherwise. Though I noted throughout my dealings with Ms. Armster that she had certainly a decrease in mental functioning to accompany her physical loss; and she was at times slow - - usually was always slow to respond to any verbal questioning. But at least on her initial visit I'd say she was slow to respond, but had accurate responses, and I noted that at other visits, too.

Dr. Armetta stated that she did not ask Mrs. Armster any particular questions to check her mental status. She also stated that there were times that Mrs. Armster would have to be prompted by her husband or Ms. Nixon in order to answer questions, such as those regarding her history, stating

"she would sometimes remember and other times she wouldn't."  She also affirmed that it was safe or fair to say that Mrs. Armster's mind was clearer at some times than at others.

The trial court stated in its findings of fact that "The medical testimony of Nancy Anne Armetta filed by the Petitioners does not conflict with the testimony concerning Mrs. Armster's competency on the date she executed the documents."  We agree.  Dr. Armetta testified that Mrs. Armster was "slow to respond but had accurate responses," which is totally consistent with the testimony given by those who witnessed the execution of the documents.  In addition, Dr. Armetta's testimony that Mrs. Armister was clearer on some days than others was also consistent with the testimony of other witnesses.  Finally, having not seen Mrs. Armster since September of 1997, the doctor had no actual knowledge of Mrs. Armster's capacity on or around the days the documents were executed, September 10 and October 19, 1998.

The four children of Mrs. Armster testified.  The appellant testified that his mother lacked the capacity to understand the documents she executed.  He attributed the beginning of her mental decline to the accident and the 1993 hospitalization.  Among the reasons he gave for his conclusion were his mother's statement that she wanted to go home when she was at home, the fact his mother no longer told stories, and that she did not carry on any conversations in depth.  The other three children expressed similar concerns, and indicated they did not think their mother had recognized them when they visited.  One stated she did not seem to know it was her birthday "because [when] we had said Happy Birthday, she was kind of blank."   The children's visits varied in frequency and duration among them.

Much of the testimony of the children described their perceptions of the role Ms. Nixon had assumed with the Armsters, their parents' relationship, and their belief that their mother did not transact business and had not been involved in business decision making for a long time.

The trial court found that Mrs. Armster did, in fact, have the requisite capacity when she executed the documents at question.  The court found that the medical evidence did not contradict the evidence from those present at the time of execution.  To the extent there was any conflicting testimony from lay witnesses regarding Mrs. Armster's capacity at the relevant time perior, the trial judge heard all the witnesses and weighed their respective testimony.  We cannot say that the evidence presented by Appellant preponderates against the trial court's findings.  We also agree that Appellant failed to meet the burden of proof necessary to set aside validly executed insruments.  Therefore, we affirm the trial court on this issue.

### III.  Undue Influence

Appellant claims that his father, Mr. Armster Sr., and/or Ms. Nixon asserted undue influence over Mrs. Armster in the execution of the documents.  Further, he alleges that a confidential relationship existed between Mrs. Armster and Mr. Armster and that this relationship gave rise to a presumption of undue influence. The trial court found that there was no undue influence asserted by these parties over Mrs. Armster.

Undue influence "upon a testator consists in substituting the will of the person exercising it for that of the testator." 1 JACK W. ROBINSON, SR. & JEFF MOBLEY, PRITCHARD ON THE LAW OF WILLS AND THE ADMINISTRATION OF ESTATES § 124, at 203 (5th ed. 1994). The essential issue on a question of undue influence is whether "the will is the will of the testator or that of another." *Id.* at § 130, at 210. "A valid will is the product of the free exercise of independent judgment by a person who has the mental capacity to make a testamentary disposition." *In re Estate of Elam,* 738 S.W.2d 169, 171 (Tenn. 1987).

Thus, undue influence exists where the free agency of a testator is destroyed to the extent that the will, though nominally the testator's own, is in reality that of another. *Taliaferro v. Green*, 622 S.W.2d 829, 837 (Tenn. Ct. App. 1981), *overruled on other grounds by Matlock v. Simpson,* 902 S.W.2d 384, 386 (Tenn. 1995). Any conveyance may be attacked on the grounds of undue influence. *See Fell v. Rambo*, 36 S.W.3d 837, 847 (Tenn. Ct. App. 2000).

As a general rule, it is presumed that undue influence does not enter into the making of a will, or other conveyance, and the burden of proving undue influence falls upon the person contesting the document. *Hammond*, 189 Tenn. at 109, 222 S.W.2d at 383-84. Thus, proof of due execution shifts the burden of going forward to the contestants to prove that the testator was unduly influenced in making his or her will. *In re Estate of Elam,* 738 S.W.2d at 171; *Owen v. Stanley,* 739 S.W.2d 782, 787 (Tenn. Ct. App. 1987), *overruled on other grounds by Matlock,* 902 S.W.2d at 386 n.10.

> While undue influence can be proved either by direct or circumstantial evidence, *see In re Depriest's Estate*, 733 S.W.2d 74, 78 (Tenn. Ct. App. 1986) (direct evidence); *Patton v. Allison*, 26 Tenn. (7 Humph.) 320, 333 (1846) (circumstantial evidence), direct evidence is rarely available. *Hager v. Hager,* 17 Tenn. App. 143, 161, 66 S.W.2d 250, 260 (1933). Thus, in most cases, those attacking a conveyance or will on the grounds of undue influence must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently.

*Fell v. Rambo*, 36 S.W.3d at 847 (citations omitted).

The existence of a confidential relationship is one of the "suspicious circumstances" most frequently relied upon to show undue influence. *Fell*, 36 S.W.3d at 847-48; *see also In re Elam's Estate*, 738 S.W.2d at 173; *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Taliaferro*, 622 S.W.2d at 835-36. A confidential relationship is not merely one of mutual trust and confidence, but one where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party. *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989). If a confidential relationship is proved, in some circumstances a presumption of undue influence arises.

> The dominant rule in Tennessee and elsewhere is that the existence of a confidential relationship, followed by a transaction where the dominant party *receives a benefit from the other party*, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction.

*Matlock*, 902 S.W.2d at 386 (emphasis added).

Tennessee courts recognize two types of confidential relationships in this context. Proof of the existence of a "legal confidential relationship" automatically gives rise to the presumption of invalidity of the transaction. *Matlock*, 902 S.W.2d at 385. A "legal confidential relationship" is one, such as conservator and ward, to which the law imposes fiduciary responsibilities or "prohibits gifts or dealing between the parties." *Id.* at 385-86 (quoting *Kelly*, 558 S.W.2d at 848). Where, however, the relationship arises from "family or other relationships," proof of the additional elements of dominion and control is necessary to give rise to the presumption of undue influence. *Matlock*, 902 S.W.2d at 385-86; *see also Mitchell*, 779 S.W.2d at 384.

There is no proof in the record that a "legal confidential relationship" existed between Mrs. Armster and either Mr. Armster or Ms. Nixon at the time the challenged documents were executed.[13] Further, there is no direct proof that either person coerced Mrs. Armster to get her to sign the documents. Appellant asserts that his father was in a confidential relationship with his mother and exercised dominion and control over her to the extent that her free agency was overcome. Regardless of whether Appellant was able to show some control by Mr. Armster over the preparation and execution of the documents sufficient to prove existence of a confidential relationship, however, he was still unable to show the second element required to give rise to the presumption of undue influence: a benefit. *Matlock*, 902 S.W.2d at 385.

As stated above, a benefit must be received by the dominant party to a confidential relationship in order to give rise to a presumption of undue influence. *Matlock*, 902 S.W.2d at 386. Neither Mr. Armster, nor Ms. Nixon obtained a benefit from the will, the trust, or the power of attorney. The trust that Mrs. Armster created benefitted her for her lifetime and then named The Bible Hygiene New Direction Training Center as beneficiary. The Trust was the beneficiary of her will. Mr. Armster and Ms. Nixon received no benefit under this will except to see the continuation of the center and mission to which they, as well as Mrs. Armster, dedicated their lives. This is not the type of benefit which creates a presumption of undue influence.[14]

---

[13] A power of attorney would create such a confidential relationship. However, the power of attorney herein was signed at the same time as the other documents being challenged. Therefore, it was not in effect at the time that the will, deeds and trust documents were signed.

[14] *See, e.g., In re Elam's Estate*, 738 S.W.2d 169, 173 (Tenn. 1987); *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Richmond v. Christian*, 555 S.W.2d 105 (Tenn. 1977); *Taliaferro*, 622 S.W.2d at 835-36; *Turner v. Leathers*, 191 Tenn. 292, 232 S.W.2d 269 (1950); *Fell*, 2000 WL 546260; *In Re Estate of Carnahan*, No. M1999-00494-COA-R3-CV, 2000 WL 1701986, at *3 (Tenn. Ct. App. Nov. 15, 2000) (no Tenn. R. App. P. 11 application filed).

-15-

Without the presumption, Appellant had the burden of proving undue influence by proof of suspicious circumstances. Whether the circumstances relied upon by the person challenging the document are sufficient to invalidate it should be "decided by the application of sound principles and good sense to the facts of each case." *Halle v. Summerfield,* 199 Tenn. 445, 454, 287 S.W.2d 57, 61 (1956). Once the challengers present sufficient evidence to substantiate their undue influence claim, the proponents of the document must present clear and convincing evidence that the challenged transaction or testamentary disposition was fair. *Matlock,* 902 S.W.2d at 386; *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977); *Bills v. Lindsay,* 909 S.W.2d 434, 440-41 (Tenn. Ct. App. 1993).

> The range of inquiry may cover, not only the provisions of the will itself, and the circumstances surrounding its execution, but also the mental condition of the testator, the motive and opportunity of others to influence him unduly, his relations with persons benefitted by or excluded from the will, and the acts and declarations of such persons. Although none of these matters standing alone may be sufficient to establish the issues, yet taken together they may have that effect. *Hager v. Hager*, 17 Tenn. App. at 161, 66 S.W.2d at 260.

*Mitchell*, 779 S.W.2d at 388.

Our courts have recognized suspicious circumstances supporting a finding of undue influence as including (1) the existence of a confidential relationship; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will; (4) secrecy concerning the will's existence; (5) the testator's advanced age; (6) the lack of independent advice in preparing the will; (7) the testator's illiteracy or blindness; (8) the unjust or unnatural nature of the will's terms; (9) the testator being in an emotionally distraught state; (10) discrepancies between the will and the testator's expressed intentions; and (11) fraud or duress directed toward the testator. *Mitchell*, 779 S.W.2d at 388 (citations omitted). As stated above, undue influence can be proved either by direct or circumstantial evidence. *In re Depriest's Estate*, 733 S.W.2d 74, 78-79 (Tenn. Ct. App. 1986). However, without direct evidence of undue influence, persons contesting a will must prove the existence of more than one suspicious circumstance in order to succeed. *In re Estate of Cranor*, No. M1997-00231-COA-R3-CV, 2000 WL 343787, at *8 (Tenn. Ct. App. Apr. 4, 2000) (no Tenn. R. App. P. 11 application filed) (citing *Halle v. Summerfield*, 199 Tenn. at 455, 287 S.W.2d at 61).

There is no evidence in the record that either Mr. Armster or Ms. Nixon coerced Mrs. Armster into signing the documents. To the contrary, all those present at the execution testified that Ms. Nixon, although present in the room, did not participate in any way in the discussion or execution of the documents. The witnesses also testified to the loving relationship between Mr. and Mrs. Armster, including their holding hands at times during the meeting. Mr. Armster gave Mrs. Armster no instructions during the discussion and execution. Mr. Plant explained the documents to Mrs. Armster and gave her the opportunity to ask questions or voice objections.

The purpose of the codicil was to recognize and express affection for the Armsters' children but to reaffirm the disposition of her estate to furtherance of the ministry. In other words, it was a

direct indication of Mrs. Armster's intent not to leave any part of her estate to her children. Mr. Plant was convinced that it was Mrs. Armster's desire to leave her property to the center, not to her children. It is Appellant's contention that such a disposition could not be the product of his mother's free will and offers as evidence that Mr. Armster procured the drafting of the documents in question and that "perhaps . . . Elder Armster realiz[ed] . . . that he . . . would likely predecease his wife . . . and came up with a plan to accomplish his will . . . ."

The children testified to the dominance of their father over their mother throughout their long marriage as well as after Mrs. Armster's injury. However, there was other testimony to the contrary. Friends of the Armsters discussed their devotion to each other and their commitment to their marriage. The children testified that the move to Tennessee and the establishment of the training center was their father's dream, but not their mother's, and that she wanted to stay in California with her children. Again, this testimony was also contradicted by others, including longtime friends. In fact, two such friends testified that Mrs. Armster had long been a devoted Christian, dedicated to prayer and regular observances in family life. Early in their marriage, she had prayed for her husband's conversion to Christianity and welcomed and supported his later dedication.

The Tennessee Supreme Court has stated that "it is not influence that invalidates a conveyance or will but undue influence" and a person "has a right by fair argument or persuasion to induce another to make a will [or sign a deed] and even to make it in his own favor," provided that the influence is "exerted in a fair and reasonable manner, and without fraud or deception." *Kelly*, 558 S.W.2d at 847; *Harper*, 670 S.W.2d at 621. The Supreme Court also stated that the influence "must go to the extent of depriving the testator of his free agency, and amount to moral coercion which he is unable to resist." *Halle*, 199 Tenn. at 454-55, 287 S.W.2d at 61.

The effect of undue influence is that the influence creates a disposition contrary to the independent will of the testator or grantor. *Crain v. Brown*, 823 S.W.2d 187, 194 (Tenn. Ct. App. 1991); *Puckett v. Krida*, No. 01-A-01-9403-CV00100, 1994 WL 475863, at *5 (Tenn. Ct. App. Sept. 2, 1994) (Perm. app. remanded Feb. 21, 1995). Because the effect of undue influence creates a disposition contrary to the independent will of the testator or grantor, courts will look at whether the disposition is unjust or unnatural or whether it differs from the testator's expressed intentions. *Mitchell*, 779 S.W.2d at 388. A case relied upon by Appellant, *Richmond v. Christian*, 555 S.W.2d 105 (Tenn. 1977), includes examples of this type of inquiry. In *Richmond*, an elderly woman, who lived with one of her children, in essence revoked an earlier division of her estate equally among her three children by giving by deed the only asset she owned to the one child, reserving no life estate for herself, twenty days before her death. The court found a presumption of undue influence had arisen on the basis of several circumstances, including the fact that the donor's gift "denuded her of all her realty, thus impoverishing her." In addition, the court stated, "Likewise significant is the fact that, without apparent reason, Mrs. Christian suddenly changed her plan to make an equal division of her real estate among her three children and, instead, decided to make a wholesale transfer to her son." *Id*. at 108. The court further noted:

We find nothing in the record to show that Mrs. Christian had a sudden, dramatic change in feeling toward her daughters after the deeds were drafted making an equal division of her property between her daughters and her son. The daughters visited their mother regularly during her illness after the December, 1970, hospitalization and at least one of them, Mrs. Richmond, visited her every day. Mrs. Terry testified that her mother had always told her the estate would be equally divided among the children. The daughters were not informed of the new deed conveying the entire tract to the defendant until after the death of their mother.

*Id.* at 109.

There is no evidence that Mrs. Armster had made any previous disposition of her property to her children or anyone else or that she had indicated that was her intent. To the contrary, there was testimony that Mrs. Armster stated that she loved her children, but she wanted to make the dispositions evidenced by the documents. Additionally, the documents executed by Mrs. Armster did not pauperize her; instead, they provided her with income for her life.

Essentially, Appellant's argument is that, although his father intended that his estate go to the ministry and center he had established, it was somehow contrary to his mother's independent will for her to similarly give her estate to the same purpose she had worked for and thereby disinherit her children, presumably the natural objects of her bounty. The trial court made the following findings of fact:

Mr. and Mrs. Armster were married for 58 years and had five children. One child predeceased Mr. Armster and the other four children testified at this trial. The Petitioner, Robert L. Armster, Jr. resides in Tennessee. The other three children, Rhoena B. Armster, Barbara Armster Butler anf Maurice Armster reside in California. Early in the marriage Mr. Armster started a ministry either with his wife or with the support of his wife.

Mr. and Mrs. Armster provided private education for their children. All of the children appear to be doing well. . . . None of the children followed their parents into the ministry.

Sheri Sakai, a friend of the Armsters for approximately 25 years, came from California to testify about her relationship with the Armsters. She testified that Mr. Armster had told her that they had provided each of their children with private school educations and that he now wanted to strive to fulfill his dream concerning his ministry. . . .

Based on the testimony of witnesses, the Court does not find Mrs. Armster executed the documents under undue influence of Mr. Armster or Ms. Nixon. Mrs. Armster had been married to Mr. Armster for 58 years, she had worked with him in the

ministry in numerous states and was actively involved in the ministry. Mrs. Armster appears to have been a strong person, mother and wife.

Although the deeds in question, together with the Living Trust, in effect disinherit the four children, they allow the ministry, which was so fundamental to the life of Mr. and Mrs. Armster throughout 58 years of marriage, to continue.

The evidence does not preponderate against these findings of fact. Tenn R. App. P. 13(d). To the contrary, the evidence supports these findings. The evidence presented shows that the creation of the trust was the fulfillment of the desire of both Mr. and Mrs. Armster that their work continue beyond their lives. We find no evidence in the record that Mrs. Armster would have disposed of her assets in any other way. The appellant has failed to meet his burden to prove that the dispositions made by Mrs. Armster were the product of undue influence. Therefore, we affirm the trial court's decision on that issue.

### V. Frivolous Appeal

Finally, Appellees maintain that the very "nature of this type of case requires that any judgment be predicated almost entirely upon witness testimony and the Chancellor's evaluation of those witnesses' credibility or lack thereof." Further, they argue that no witness who was present on September 10, 1998, testified that Mrs. Armster was not mentally competent; therefore, there was no evidence on which to base this appeal.

It is well settled that successful parties should not have to bear the cost and vexation of baseless appeals. *Jackson v. Adridge*, 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999) (citing *Davis v Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977)); *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989). The Tennessee Code Annotated has defined an appeal as frivolous:

> when it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122 (1996). Further, this court has stated that appeal is considered frivolous if there is no reasonable chance of success or is devoid of merit. *Jackson,* 6 S.W.3d at 504. However, an award of damages under this section of the Tennessee Code is discretionary. *Banks v. St. Francis Hosp.*, 697 S.W.2d 340, 343 (Tenn. 1985).

While Appellants did not succeed with their appeal, we do not perceive that they appealed solely to cause delay or for some other improper purpose. Genuine disagreements regarding the facts or conclusions to be drawn form the facts provide a sufficient basis for an appeal and provide an appropriate basis for declining to award frivolous appeal damages. *Anderson v. Dan Truck Line, Inc.*,

682 S.W.2d 900, 902 (Tenn. 1984); *Liberty Mut. Ins. Co. v. Taylor*, 590 S.W.2d 920, 922-23 (Tenn. 1979).  Accordingly, we decline to find this appeal frivolous.

Costs of this appeal are taxed to the appellant, Robert L. Armster, Jr., for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE